# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

JOHN H. McKOWN, IV,                                    CASE NO. 1:09-cv-00810-SKO

                Plaintiff,          **ORDER DENYING PLAINTIFF'S**
**APPEAL OF CLAIMS PURSUANT TO**
**THE ADMINISTRATIVE**
**PROCEDURE ACT**

    v.

                                  (Docket No. 62)

UNITED STATES OF AMERICA, et al.,

                Defendants.

_____/

## I. INTRODUCTION

On July 6, 2012, Plaintiff John H. McKown IV ("Plaintiff") filed his opening brief, pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-06, in support of his appeal of the decision issued by the United States Department of the Interior, Interior Board of Land Appeals ("IBLA") in *United States v. McKown*, 181 IBLA 183 (June 30, 2011).  (Doc. 59.) On August 13, 2012, Defendant United States of America and the other federal defendants (collectively, "Defendants" or the "Government") filed their response brief in opposition to Plaintiff's appeal. (Doc. 62.)  Plaintiff filed his reply brief on August 23, 2012, and Defendants' reply brief was filed on September 7, 2012.[1]

Plaintiff appeals the finding by the IBLA that three unpatented mining claims to which he asserts an interest are invalid for lack of discovery of a valuable mining deposit.  Defendants assert

_____

[1] The Joint Proposed Schedule submitted by the parties established that Defendants would file a reply memorandum.  (Doc. 49.)

that the IBLA correctly determined that the evidence submitted by the Government during the administrative hearing was sufficient to establish a prima facie case of invalidity of the mining claims and that Plaintiff failed to meet his burden to rebut the prima facie showing and prove by a preponderance of the evidence that the mining claims were valid.

The Court has reviewed the parties' briefs and supporting documents and determined that this matter is suitable for decision without oral argument pursuant to the Local Rules of the United States District Court, Eastern District of California, Rule 230(g). For the reasons set forth below, Plaintiff's appeal of his APA claims is DENIED.

## II. BACKGROUND

### A. Relevant Mining Law

Under the General Mining Law of 1872, 30 U.S.C. §§ 21-54, (the "Mining Law") miners have limited rights for prospecting and mining valuable mineral deposits on federal land. The Mining Law allows private parties to acquire nonexclusive possessory interest on federal land and to assert a claim for mining purposes and ownership. *See United States v. Shumway*, 199 F.3d 1093, 1098-99 (9th Cir. 1999). Further, the Mining Law permits the location of valuable mineral deposits on United States' public land. *See* 30 U.S.C. § 26. Location refers to a miner's identification of a particular mineral deposit and to his claim of exclusive mineral rights over that deposit. The location system provides that the first mineral claimant who identifies a valuable deposit of a locatable mineral and who fulfills the Mining Law's administrative requirements is entitled to produce all the minerals from the deposit without being required to purchase fee simple title from the United States. *See* 1 Am. L. of Mining § 30.01 (2d ed.). The Mining Law permits location of valuable mineral deposits on United States public lands. *See* 20 U.S.C. § 26.

Once a valuable mineral deposit has been located, the unpatented mining claim "is a property right in the full sense, unaffected by the fact that the paramount title to the land is in the United States," *Union Oil Co. of Cal. v. Smith*, 249 U.S. 337, 349 (1919), and constitutes a property interest "which is within the protection of the Fifth Amendment's prohibition against the taking of private property for public use without just compensation," *Skaw v. United States*, 740 F.2d 932, 936 (Fed. Cir. 1984). The Ninth Circuit, however, has determined that, while a mining claimant may possess

2

a property interest in an unpatented mining claim, "the property right in an unvalidated claim . . . may permissibly be restricted pending determination of validity, in order to guard against damage to the claim and surrounding land." *Clouser v. Espy*, 42 F.3d 1522, 1535 n.15 (9th Cir. 1994).

A mining claim's validity is dependent upon the discovery of a valuable mineral deposit. *See* 30 U.S.C. § 22. "[T]o qualify as valuable mineral deposits, the discovered deposits must be of such a character that a person of ordinary prudence would be justified in the further expenditure of his labor and means, with a reasonable prospect of success, in developing a valuable mine." *United States v. Coleman*, 390 U.S. 599, 602 (1968) (citation and quotation marks omitted).  In applying this "prudent man test," profitability of the claim must be considered. *See Hjelvik v. Babbitt*, 198 F.3d 1072, 1074 (9th Cir. 1999) (citing *Coleman*, 390 U.S. at 602).  "The supplemental marketability test requires a showing that the mineral deposit can be extracted, removed, and marketed at a profit." *Hjelvik*, 198 F.3d at 1074; *see also Baker v. United States*, 613 F.2d 224, 226 (9th Cir. 1980).

Where a mining claim is located on land withdrawn from mineral entry under the Wilderness Act, 16 U.S.C. §§ 1131-36, the claimant must prove discovery of a valuable mineral deposit at the time of a withdrawal. *See Wilderness Soc'y v. Dombeck*, 168 F.3d 367, 375 (9th Cir. 1999); *United States v. Mavros*, 122 IBLA 297, 301 (1992) ("When land is withdrawn from the operation of the mining laws the existence of a discovery on the date of withdrawal is critical to a validity determination.") (citing *Cameron v. United States*, 252 U.S. 450, 456 (1920)).  The claimant must also demonstrate that the mining claim is valid at the time of the contest hearing. *See Hjelvik*, 198 F.3d at 1074; *Lara v. Sec'y of Interior*, 820 F.2d 1535, 1542 (9th Cir. 1987) ("Because the right to prospect for minerals ceases on the date of withdrawal, a discovery must have existed at the date of withdrawal as well as at the date of the hearing.") (internal citation omitted).  As such, a claim must be shown to be valid at *both* the time of the withdrawal and at the time of the contest hearing.

When the Government contests a mining claim, the Government bears the burden of establishing a prima face case that the claim is invalid. *Hjelvik*, 198 F.3d at 1074-75.  Once the Government establishes a prima facie case, the burden of proof devolves to the claimant who must refute by a preponderance of the evidence the Government's case. *Id*. at 1075 (citation omitted). The claimant must establish "that a valuable mineral deposit has been discovered." *Lara*, 820 F. 2d at

3

1542. Thus, while the Government bears the initial burden, it is the claimant, not the Government, who bears the ultimate burden of persuasion concerning the validity of the claims. *See id*.

**B.    Factual and Procedural Background**

**1.    Plaintiff's Initial Claims**

Plaintiff alleges in his first amended complaint ("FAC") that Plaintiff's family has held title to the quartz mining claims known as White Cap Nos. 1-3 (the "mining claims"), located in Kern County, California, since 1969, and that the mining claims have been in Plaintiff's family since the turn of the 20th century.  (Doc. 48, ¶¶ 58, 69.)  Plaintiff indicated in his opening brief that he inherited the mining claims from his uncle. (Doc. 59, 7:3-4.)

On October 28, 1993, Plaintiff filed Lode Mining Claim Notices with the U.S. Department of the Interior, Bureau of Land Management ("BLM"), California State Office, identifying the three mining claims, White Cap Nos. 1-3, that are the subject of this action.  (Administrative Record ("AR") 2342-50; *see also McKown*, 181 IBLA at 185.)  The White Cap Nos. 1-3 claims are located within the northeast quarter of Section 17, Township 27, Range 36E.  (AR 2342, 2345, 2348.)  Defendants contend that the White Cap Nos. 1-3 claims are located within the boundaries of both the Sequoia National Forest and the Kiavah Wilderness.  (Doc. 62, 10:2-4 (citing AR 1218 and *McKown*, 181 IBLA at 186 (affirming the Defendants' contention)).)  Plaintiff, however, apparently contends that the White Cap Nos. 1-3 claims are (or may be) located outside of the Kiavah Wilderness.  (*See* Doc. 48 (FAC), ¶ 31, 61; Doc. 59, 30:9-13.)

On October 31, 1994, Congress enacted the California Desert Protection Act of 1994 ("CDPA"), Pub. L. No. 103-433, 108 Stat. 4471 (codified in part at 16 U.S.C. §§ 410aaa to 410aaa-83).  Among the provisions of the CDPA was the establishment of the Kiavah Wilderness as part of the National Wilderness Preservation System, and subject to the restrictions imposed by the Wilderness Act, 16 U.S.C. §§ 1131-36.  *See* CDPA § 102(31), 108 Stat. at 4476.  These restrictions include the proscription of commercial enterprise, permanent roads, and the use of motorized equipment within wilderness areas.  *See* 16 U.S.C. § 1133(c).  Subject to valid existing rights, the CDPA expressly withdraws lands within the Kiavah Wilderness "from location, entry, and patent under the United States mining laws."  CDPA § 104(c), 108 Stat. at 4483.

On December 27, 1994, by letter recorded in Kern County, California, Plaintiff submitted to the United States Forest Service ("Forest Service") a Notice of Intent ("NOI"), asserting that there was a "proven reserve" in the White Cap Nos. 1-3 claims of 36,450 metric tons of quartz "visible in the open intrusive veins." (AR 1130-32; *McKown*, 181 IBLA at 186.)  Plaintiff's NOI indicated that the mineral rights met the "validity regulations" to justify extraction. (*See* AR 1130.)  Based on testing performed by Plaintiff's consultant, Robert J. Michel, Ph.D.[2], Plaintiff asserted that the "conservative estimate" of the value of the mineral deposit was over $65 million. (AR 1131, *McKown*, 181 IBLA at 186.)  The NOI indicated that Plaintiff would be escorting potential buyers to the site, likely taking small samples of the quartz, and potentially drilling two holes on the claims in the spring of 1995 to more accurately estimate the volume of the quartz deposit. (AR 1130-31; *McKown*, 181 IBLA at 186.)

On February 16, 1995, the District Ranger for the Forest Service informed Plaintiff that before any work could be performed, Plaintiff would "need to file a detailed Plan of Operations . . . regarding [the] proposed operations." (AR 1137-38; *McKown*, 181 IBLA at 186.)  The District Ranger advised Plaintiff that the Forest Service would evaluate "whether the materials on [Plaintiff's] claims are considered to be locatable minerals" and that, "[i]f the determination is made that these materials are indeed locatable minerals, then work can proceed on the Plan of Operations." (AR 1137; *McKown*, 181 IBLA at 186.)  However, the District Ranger also informed Plaintiff that if the proposed work in the Plan of Operations "includes any activities which would cause a significant disturbance that would not be in keeping with the intent of the wilderness designation," then a "Valid Existing Rights Determination must be conducted on the claims" before any proposed operations would be approved. (AR 1137; *McKown*, 181 IBLA at 186.)

Jim Voss, a geologist and Forest Service Certified Mineral Examiner, conducted a review of the report entitled "Survey and Evaluation of the Quartz Mining Company Called White Cap Owned by John McKown" and submitted by Dr. Michel on behalf of Plaintiff. (AR 1143-51; *see also* AR 1047-53; *McKown*, 181 IBLA at 187.)  Voss noted that Dr. Michel "collected rock chip

---

[2] Although Dr. Michel held a Ph.D. and a patent for purifying minerals, his discipline and area of expertise was not identified by Plaintiff or indicated in the record. (*See McKown*, 181 IBLA at 186, n. 5.)

samples from the exposed mineralization for analysis" and "later composited the chips into one sample and analyzed that composite by wet chemical methods." (AR 1144.) However, Voss observed that Dr. Michel's report did not identify Dr. Michel as a certified chemist or assayer, did not identify who performed the chemical testing upon which Dr. Michel's results were based, and did not state what methodology was used to test the samples. (AR 1144; *McKown*, 181 IBLA at 187.) As such, Voss found that "[t]here is no statistical basis for concluding that the deposit is suitable for <u>any</u> specific industrial use based on only one or two analyses." (AR 1144.) Voss concluded that, "[o]verall, the [Dr. Michel] report does not make a conclusive argument for the quality and quantity of the quartz present in the White Cap claims." (AR 1146.) Voss noted that a locatable mineral "must be suitable and used" in an identified market and determined that "[t]here is no substantial data to support the presence of any specific markets for this quartz material in [Dr. Michel's] report." (AR 1145; *McKown*, 181 IBLA at 187.)

On April 5, 1995, the District Ranger informed Plaintiff via letter of the findings of Voss' report and reiterated that if Plaintiff "propose[d] any work on [his] claims which would cause surface disturbance," he was required to "file a detailed plan of operations." (AR 1153, *McKown*, 181 IBLA at 187.) Plaintiff was also informed that the Forest Service's mineral examiner would need to meet with Plaintiff concerning the claims "to evaluate [Plaintiff's] proposal, to discuss any markets [Plaintiff] . . . had or may have for the materials from [his] claims and to conduct a 'Valid Existing Rights Determination' if necessary." (AR 1153; *McKown*, 181 IBLA at 187.) On September 8, 1995, Voss also sent a letter to Plaintiff, stating that he would "meet with [Plaintiff] and [Plaintiff's] prospective purchaser in the field sometime in the near future to explain further to both [of] them the requirements for demonstrating valid existing rights." (AR 1156, *McKown*, 181 IBLA at 187.)

Plaintiff did not file a Plan of Operations with the U.S. Forest Service until March 10, 2000, almost five years after being informed that such a plan was necessary. (AR 1159-71; *McKown*, 181 IBLA at 187.) On June 30, 2000, the District Ranger requested a validity examination of Plaintiff's claims, which was performed by Defendant Michael D. Dunn ("Dunn"), a geologist and Certified Mineral Examiner with the Forest Service, and by geologist Tracy V.L. Parker (the "Mineral Examiners"). (AR 1212, 1220; *McKown*, 181 IBLA at 187.)

### 2.     The Validity Examination and the Mineral Report

On May 5, 2006, the Forest Service completed a comprehensive Mineral Report and Validity Examination (the "Mineral Report") of the White Cap Nos. 1-3 claims. (AR 1212-1410.) The report indicates that on October 24 and 25, 2000, Forest Service personnel, including Dunn, and Plaintiff and Plaintiff's representative Rick Miller conducted an initial field examination. (AR 1237-39; *McKown*, 181 IBLA at 187.)   During this field work, initial discovery points were identified by Plaintiff and his representatives, the mineral deposits were investigated, mapped and measured, samples were taken for analysis, and the claims were searched for additional discovery points. (AR 1237-38; *McKown*, 181 IBLA at 187.)  With the exception of the exposed quartz deposit on White Cap No. 1, no additional exposed outcrops of quartz were identified on any of the claims. (AR 1238; *McKown*, 181 IBLA at 188.)

A second site inspection was made by Dunn and his associate Parker on May 30 and 31, 2001, to locate the remaining claim corners, map the rest of the claim geology, and dig pits below the quartz outcrop to determine if there was a continuation of quartz down the slope of White Cap Nos. 1 and 3. (AR 1238-39; *McKown*, 181 IBLA at 187-88.)  The Mineral Examiners dug fourteen exploratory pits to bedrock, which was granodiorite and not quartz; unsuccessfully searched the claims for additional quartz outcrops; and gathered samples for comparison and analysis. (AR 1239; *McKown*, 181 IBLA at 188.)

On May 23, 2002, the Mineral Examiners made a third site visit at the request of Plaintiff's representative Miller after Plaintiff hired the consulting company of David Brown and Associates ("Brown") to independently sample the claims. (AR 1239; *McKown*, 181 IBLA at 188.)  The Mineral Examiners were asked to monitor the investigation of Brown and to answer questions. (AR 1239; *McKown*, 181 IBLA at 188.)  On June 26, 2002, Brown submitted a Preliminary Evaluation to Miller indicating that "[t]he silica appears to be either a hydrothermal alteration product of pre-existing wall rock or roof pendant; or is a massive, pervasive bull quartz vein. . ." (AR 1182; *McKown*, 181 IBLA at 188.)  The Brown report recommended that Plaintiff seek approval by the Forest Service to begin "test drilling . . . as soon as possible" to more accurately determine the volume of the quartz. (AR 1183; *McKown*, 181 IBLA at 188.)

Dunn completed the 191-page Mineral Report on May 5, 2006, which was approved by the Forest Service management on March 5, 2007. (AR 1212-1410; *McKown*, 181 IBLA at 188.) Based on the results of field examinations and sampling of the claims, the Mineral Report concluded that White Cap No. 1 "has a milky white quartz outcrop in the center of the claim that warranted further evaluation" and that White Cap Nos. 2 and 3 "did not have any significant quartz resources and were eliminated from further consideration." (AR 1218; *McKown*, 181 IBLA at 188.) The Mineral Report conducted an economic analysis of the silica in the White Cap No. 1 claim and concluded that the only potentially viable market as of October 31, 1994 (the time of the removal as a Wilderness designation) was for manufacturing flatglass and/or fiberglass. (AR 1247-60; *McKown*, 181 IBLA at 188.)

While the Mineral Report considered the "Dr. Michel process" that Plaintiff "purported [would] produce a +99.9999 % silica (silicon dioxide) material from +99.0 % silica for use in any application where high-purity silica is required," the Report concluded that the process "would be utilized at an independent processing facility that purchases material and not a processing procedure to be considered an integral part of the proposed White Cap mining operation." (AR 1252, 1254; *McKown*, 181 IBLA at 189.) Although the Mineral Examiners were unwilling or unable to enter into a confidentiality agreement regarding Dr. Michel's process, which was purportedly in the patenting stage, they were provided with a general description of the process. (AR 1253; *McKown*, 181 IBLA at 188-89, n. 7.) The Mineral Report concluded that Dr. Michel's process "is not in use and has not been demonstrated to be viable" and that the process "could be [used] by a potential buyer of occasional loads of quartz for test purposes but the value of this quartz as lump silica would be no more than the value of silica sand in the glass manufacturing industry, and possibly less because lump silica would require more processing than would sand." (AR 1254; *McKown*, 181 IBLA at 189.)

The Mineral Report noted that Plaintiff and his associates "provided little detail of their proposed mining operations and they did not have a specific market identified for the quartz to help determine a suitable milling and processing operation." (AR 1260; *McKown*, 181 IBLA at 189.) On September 25, 2001, the Mineral Examiners requested that Plaintiff provide detailed mining and

processing information.  (AR 1260, 1327-29; *McKown*, 181 IBLA at 189.)  Plaintiff "provided no additional specifics" but instead provided correspondence from a mining contractor, Mel Adams, who indicated that "he would do the job from start to finish for $27 per ton."  (AR 1260, 1387-88; *McKown*, 181 IBLA at 189.)   However, the Mineral Examiners concluded that Adams "only provided brief generalities on how he intended to accomplish this task and stated that it was impossible to break costs down to specific pieces of equipment."  (AR 1260, *see also* AR 1387-88; *McKown*, 181 IBLA at 189.)

Accordingly, to evaluate the validity of the White Cap claims, the Mineral Examiners "determined what [they] thought would be the most reasonable methods of mining and processing."  (AR 1260; *McKown*, 181 IBLA at 189.)  The Mineral Examiners considered and set forth methods for drilling and blasting; loading and hauling; milling and transportation; mining equipment; mobilization; road construction and repair; pre-mining clearing; and reclamation.  (AR 1260-76.)  Based on those methods, the Mineral Report determined the costs for mining the quartz claims in 1994 and at the time of the validity examination.  The total mining costs in 2005 were $41.71 per ton and in 1994 would have been between $31.09 and 33.38 per ton; however, the market average price of silica sand for flatglass or fiberglass manufacture ranged between $14.82 and $20.04 per ton at these times.  (AR 1279-80; *McKown*, 181 IBLA at 189.)

The Mineral Report therefore concluded that "[a]fter a comprehensive analysis of the potential markets, we determined that due to the limited size, chemical composition, and distance from potential markets, there are no locatable minerals of sufficient quality and quantity exposed within the subject claims to constitute a discovery of a valuable mineral deposit."  (AR 1219; 181 IBLA at 188.)

**3.     The Filing of Complaints**

The Mineral Report was approved by the BLM on March 5, 2007.  (AR 1212, *McKown*, 181 IBLA at 189.)  On July 23, 2007, the BLM issued a Contest of Mining Claims Complaint pursuant to 43 C.F.R. § 4.451-1, challenging the validity of Plaintiff's mining claims as of October 31, 1994.  (AR 2057-62.)  On August 23, 2007, Plaintiff filed an answer to the BLM's complaint.

Plaintiff also filed a complaint in the instant action on May 7, 2009, alleging causes of action for (1) declaratory and injunctive relief, requesting that the Forest Service be precluded from regulating his use of three mining claims, designated as the White Cap Nos. 1-3, under the California Desert Protection Act of 1994; (2) quiet title, requesting that the Court identify him as the owner of the White Cap Nos. 1-3; (3) civil rights violations under *Bivens v. Six Unknown Federal Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971), alleging that the Forest Service officials deprived him of constitutional rights; and (4) illegal restraint of interstate commerce due to actions by officials with the Forest Service and the BLM.  (Doc. 1.)

On May 18, 2009, Plaintiff filed an additional action in the United States Court of Federal Claims ("CFC"), alleging claims related to the facts in this action.  *See McKown v. United States*, Case No. 09-371 L (Fed. Cl.).

On October 19, 2009, Defendants filed a motion to stay proceedings in the instant case, pending the resolution of the administrative dispute before the United States Department of Interior's Office of Hearing and Appeals ("OHA") regarding the determination of Plaintiff's three mining claims.  (Doc. 24.)  Defendants contended that the administrative agency's resolution of whether Plaintiff had a valid property interest in the White Cap Nos. 1-3 would likely resolve the remaining issues in this litigation.  On December 14, 2009, the Court granted Defendants' motion and the action was stayed pending the OHA's ruling on Plaintiff's White Cap Nos. 1-3 mining claims.  (Doc. 30.)  Plaintiff's CFC case was also stayed to allow the parties to complete the administrative proceedings.  (*See* Doc. 24, p. 3, n.2.)

### 4.    The Administrative Review and Decision of the OHA

A hearing was scheduled before Administrative Law Judge ("ALJ") James H. Heffernan to consider Plaintiff's mining claims.  On December 28, 2010, Plaintiff filed a motion to exclude the Government's evidence and a motion to take core samples at the claim site.  (AR 1618-35.)  On January 7, 2010, the ALJ denied both motions.  (AR 1559-70.)  Regarding Plaintiff's motion to take core samples, the ALJ found that the motion failed to properly specify a site or location.  (AR 1560-61.)  The ALJ noted that core drilling is only permitted to confirm a pre-existing discovery where there has been a prior exposure of valuable minerals and may not be conducted for the purpose of

1   exploration. (AR 1560.) The ALJ determined that, because Plaintiff's proposal lacked any

2   specificity, the motion sought "core drilling for the sole purpose of further exploration, rather than

3   for the qualifying purpose of confirmation of a prior, exposed mineral discovery." (AR 1561.)

4   From January 25-27, 2010, the ALJ conducted a public hearing in Plaintiff's validity contest.

5   (AR 154, *see also* AR 340-1035.) On May 25, 2010, the ALJ issued a decision finding Plaintiff's

6   White Cap Nos. 1-3 mining claims to be null and void. (AR 154-87; *McKown*, 181 IBLA at 193.)

7   The ALJ's decision summarized the arguments and evidence presented at the hearing.[3] (AR

8   154-70; *McKown*, 181 IBLA at 190-93.) In summarizing the Government's case-in-chief, the ALJ

9   noted the Government asserted that, other than the quartz vein pit on White Cap No. 1, there was no

10  significant exposure of mineral on either White Nos. 2 and 3, and that the claims on White Cap Nos.

11  2 and 3 were not mineral in character. (AR 7-8; *McKown*, 181 IBLA at 190.) During the hearing,

12  "Dunn testified that the exposure at the pit on White Cap [No.] 1 was '. . . not a vein extending all

13  the way down'" and estimated the volume of quartz deposit on White Cap No. 1 to be 18,980. (AR

14  160-61; *McKown*, 181 IBLA at 190.) The ALJ noted, however, that different estimates were

15  provided by the United States Geological Service, which estimated 22,000 tons of quartz, and by Dr.

16  Michel, who estimated 37,000 tons. (AR 160-61; *McKown*, 181 IBLA at 190.)

17  During the hearing, Dunn identified potential markets for the quality and quantity of the

18  exposed mineral deposit, and opined that the quartz was of sufficient quality to be used in flat

19  glass/container glass markets, lower grade silicon metal market, fiberglass markets, and fiber cement

20  board markets. (AR 158, 161-63; *McKown*, 181 IBLA at 190-91.) However, Dunn further stated

21  that the deposit was of insufficient quantity for the flat glass or container glass markets (both at the

22  time of withdrawal and the hearing) because those glass producers require at least 40,000 tons of

23  silica per year, and that the deposit was also of insufficient quantity for use by the fiberglass industry

24  (producers required in 1994 and at the time of the hearing more than 70,000 tons per year of silica,

25  an amount of minerals not present at the mining claims). (AR 158, 161-63; *McKown*, 181 IBLA at

26  190-91.) The ALJ also recognized that the Government contended that, while the quartz was of

27

28  [3] The Court has reviewed the record and found that the ALJ's summary is a fair and accurate representation of the proceedings. As such, for simplicity and convenience, the Court focuses upon and cites to the ALJ's summary.

sufficient quality and quantity for use by silicon metal smelters, the transportation costs of $80 per ton would far exceed the price of $20 per ton the paid by the smelters. (AR 158; *McKown*, 181 IBLA at 191.) Dunn concluded that the average cost of mining White Cap No. 1 on the date of withdrawal and the hearing was $48 per ton, but that the anticipated revenues were less than $18 per ton. (AR 164; *McKown*, 181 IBLA at 191.) The Government further asserted that Dr. Michel's process was still in the testing and research mode, was not tied exclusively to quartz, and was not an established technology at the time of the withdrawal or the mineral examination. (AR 162.)

The ALJ summarized Plaintiff's case-in-chief and noted that Plaintiff testified at the hearing that "Dr. Michel's process would bring the White Cap quartz to a purity of some 99.9999%," which would then "sell for some $40,000.00 per processed ton." (AR 165; *McKown*, 181 IBLA at 192.) Plaintiff further testified that Michael Jones, the President of BGM Enterprises and a director of Core Financial LLC, companies that fund development projects, was interested in purchasing Plaintiff's claims for $33.2 million. (AR 165-66; *McKown*, 181 IBLA at 192.) Jones testified that he had personally inspected the claims, believed that there were gold and rare earth deposits on the claims, had originally sought to purchase the claims for $22 million but increased his offer to $33 million, was familiar with Dr. Michel's process, and estimated that the purified quartz would be worth $59,000.00 per ton. (AR 166-67.) Jones testified that he had not completed the purchase of the White Cap claims "because of the road sign prohibiting vehicles and because he couldn't drill on the claims" due to the purported Wilderness designation and restrictions by the Forest Service. (AR 166; *McKown*, 181 IBLA at 192.)

Plaintiff's representative Miller also testified that a sign was installed on the mine access road in 1994 after the withdrawal into the Kiavah Wilderness that prohibited motor vehicles but that, according to 1943 map by the Corps of Engineers, the current road should have been excluded from the wilderness designation. (AR 165.) In rebuttal, the Government presented evidence as to the legal description of the Kiavah Wilderness and contended that the White Cap Mine access road was specifically part of the withdrawal and was closed. (AR 168.) Dunn also testified that he had advised Plaintiff in 2002 that he could core drill on the claims if he submitted an update to his 2000 Plan of Operations or if he submitted a new plan with adequate specificity regarding the core

1   drilling.  (AR 168; *McKown*, 181 IBLA at 192.)  Plaintiff "never submitted an updated, compliant

2   Plan of Operations."  (AR 168; *McKown*, 181 IBLA at 192.)  The Government also asserted that the

3   estimates provided by Plaintiff were "inaccurate" because they were "based on the price for fused

4   silica, and the White Cap quartz is not suitable for fused silica uses, because of impurities. . ."  (AR

5   169.)  Further, the Government contended that Plaintiff failed to establish "whether Dr. Michel's

6   process is currently being used by any company" and asserted that "the process is a procedure being

7   tested for research, and not an established, commercially operating process."  (AR 169.)

8       The ALJ considered the evidence submitted and determined "[o]n balance, the weight of the

9   evidence adduced at the hearing supports the government's contentions with respect to the invalidity

10  of all three of the White Cap Claims."  (AR 170; *McKown*, 181 IBLA at 192.)  The ALJ found that

11  "the subject three claims lie within the withdrawn wilderness area and are, therefore, subject to the

12  provisions of the CDPA."  (AR 170.)  Further, "the three claims are within the boundaries of

13  withdrawn public lands, including the fact that the access road leading to the claims themselves is

14  also specifically included in the boundaries of the withdrawn land."  (AR 170.)  The ALJ further

15  determined that "[t]he government examiners fully fulfilled their legal obligation to sample existing

16  exposures to determine whether the mining operations are likely to be profitable."  (AR 171 (internal

17  citation and quotation marks omitted).  The ALJ found that the hearing testimony made clear that

18  Plaintiff "and his representatives never provided the government examiners with any additional

19  viable sampling sites on any of the claims, other than the exposed pit area on White Cap Claim 1."

20  (AR 172; *McKown*, 181 IBLA at 192.)

21      The ALJ stated that "[t]he testimony of Mr. Jones that he offered to purchase the claims does

22  not, by itself, establish a valuable discovery, because mineralization and its related marketability

23  must be established independently of any offer to purchase," and further noted that Jones' offer was

24  "specifically dependent upon an application of the Dr. Michel process after extraction," and "was not

25  accompanied by evidence to confirm that the quartz was independently marketable and profitable."

26  (AR 172; *McKown*, 181 IBLA at 192.)  The ALJ rejected Plaintiff's contention that "he was deprived

27  of the opportunity to do core drilling in order to prove his claims" because "the record confirms that

28  he never filed the necessary written proposal to accomplish this end."  (AR 172; *McKown*, 181 IBLA

at 193.)  Instead, the ALJ found that Plaintiff's "correspondence with the Forest Service, which references core drilling, reflects only an unspecified future intention to do core drilling, which was never brought to fruition by the [Plaintiff] himself."  (AR 172; *McKown*, 181 IBLA at 193.)  The ALJ found that Plaintiff's cost estimates were not "updated to reflect contemporary costs" and "did not include labor costs, which are affirmatively required in a mining cost estimate."  (AR 173 (citation omitted); *McKown*, 181 IBLA at 193.)

The ALJ concluded that "the White Cap Claims Numbers 1, 2, and 3 are each invalid for lack of a valuable discovery, and . . . are, therefore, declared to be null and void."  (AR 173; *McKown*, 181 IBLA at 193.)

### 5.    The Appellate Decision by the IBLA

On June 23, 2010, Plaintiff appealed the ALJ's decision.  (AR 148-50.)  On July 1, 2010, the action was transmitted to the IBLA.  On June 30, 2011, the IBLA issued a decision affirming the ALJ's finding that the three mining claims were invalid.  *McKown*, 181 IBLA at 183.

The IBLA found that the Government established a prima facie case that Plaintiff's mining claims were not valid.  *McKown*, 181 IBLA at 196-97.  Specifically, "[t]he Government presented the testimony of its mineral examiners and introduced their Mineral Report during its case-in-chief showing that they investigated discovery points identified by the claimant, searched for exposed mineralization on White Cap Nos. 2 and 3, but found no such exposure on either of them.  The Government therefore established a prima facie case that White Cap Nos. 2 and 3 are not valid claims based on the testimony of its mineral examiners."  *Id.* at 197 (citation omitted).  As to White Cap No. 1, the IBLA determined that "the Government's case-in-chief showed that this quartz (silica) deposit was of insufficient quality and quantity to constitute the discovery of a valuable mineral deposit (i.e., the cost to mine, haul, and process its quartz (silica) would exceed the price it could command in the marketplace on both the date of withdrawal and the date of the contest hearing)," and therefore concluded that "the Government established a prima facie case that White Cap No. 1 is not a valid mining claim."  *Id.* (citation omitted).

The IBLA then determined that Plaintiff failed to "show that a lode or vein had been exposed" on White Cap Nos. 2 and 3 and thus "failed to identify a valid discovery point on these

claims, and while he asserted they contain an extension of the deposit exposed on White Cap No.

1, his assertion is not the same as or a substitute for an exposure." *Id*. at 199 (citation omitted).  As

for White Cap No. 1,  the IBLA concluded that Plaintiff did not show, by a preponderance of the

evidence, that his claim could be mined at a profit on both the date of withdrawal and the date of the

hearing. *Id*. at 200.  The IBLA rejected Plaintiff's contention that "he met his burden by allegedly

showing that the Michel process could purify his deposit's silica, which could then be sold in

high-end markets for thousands of dollars per ton, and that Jones' offer to purchase his claims or the

quartz (silica) underlying them further demonstrates his discovery of a valuable mineral deposit."

*Id*.  Instead, the IBLA determined that:

> The Government's case-in-chief showed that the Michel process did not exist on the withdrawal date and was still in the testing and research phase at the time of the hearing before ALJ Heffernan.  McKown responded with the testimony of fact witnesses who stated this process can purify his claims' silica (quartz) for sale in high-end markets for more than $40,000 per ton and hearsay testimony that the Michel process was then being used.  However, he provided no cost or supporting data on the current use of that process or any evidence the Michel process even arguably existed on the date of withdrawal. *See* Decision at 19.  The Michel process may be a valuable technology, but unsupported assertions and hearsay testimony are insufficient to preponderate and show that this process had advanced beyond the testing stage at the time of the contest hearing or could be used to process and sell his claims' silica (quartz) at a profit.  It was McKown's burden to show he discovered a valuable mineral deposit on both the date of withdrawal and the hearing.  Our review of the evidence presented on the Michel process shows that McKown did not meet his burden on either date.  We therefore reject his argument that ALJ Heffernan erred in considering either his evidence or the Michel process.

*Id*. at 202 (citation omitted).

The IBLA concluded that "we find no error in ALJ Heffernan's considering the evidence

presented and therefore conclude that he properly ruled that McKown had not shown that he

discovered a valuable mineral deposit on White Cap Nos. 1, 2, or 3, on both the date of withdrawal

and the time of the contest hearing." *Id*. at 204.  As such, the decision of the OHA was affirmed.

*Id.*

The IBLA ruling constitutes the final decision of the Department of Interior. *See* 43 C.F.R.

§ 4.21(d).

1

### 6.    The Status of the Instant Case

On October 6, 2011, Plaintiff filed a motion to vacate the Court's order staying this action as Plaintiff had exhausted all his administrative remedies.  (Docs. 38, 39.)  Plaintiff also filed a motion to amend the complaint, requesting to file a first amended complaint ("FAC") to add causes of action under the APA so as to seek judicial review of the IBLA decision.  (Doc. 40.)

On November 2, 2011, Defendants filed a response to Plaintiff's motions indicating that they did not oppose Plaintiff's motions, but "reserved the right to move pursuant to Federal Rule of Civil Procedure 12 and other applicable law" to seek dismissal of Plaintiff's FAC.  (Doc. 43, 2:25-4:1.) Further, Defendants requested that the Court stay discovery pending the resolution of the judicial review of the IBLA decision and the appeal of Plaintiff's APA claims, contending that resolution of those claims will likely obviate the remaining causes of action.  (Doc. 43, p. 3.)

Plaintiff and Defendants consented to Magistrate Judge jurisdiction on September 21, 2011, and October 14, 2011, respectively.  (Docs. 37, 41.)  As such, this case was assigned to Magistrate Judge Sheila K. Oberto for all purposes.  (Doc. 42.)

On November 18, 2011, the Court granted Plaintiff's motion to amend and allowed Plaintiff to file a FAC alleging his APA claims.  (Doc. 47.)  The Court also ordered that the case remain stayed for all non-APA claims, including discovery as to those claims.  (Doc. 47.)

On November 21, 2011, Plaintiff filed a verified FAC for declaratory, injunctive, and mandamus relief, quiet title, violations of civil rights under *Bivens*, illegal restraint of interstate commerce, and for judicial review under the APA.  (Doc. 48.)  On July 6, 2012, Plaintiff filed his opening brief in support of his APA claims.  (Doc. 59.)  Defendants' opposition brief was filed on August 13, 2012, Plaintiff's reply brief was filed on August 23, 2012, and Defendant's authorized reply brief was filed on September 7, 2012.  (Docs. 62-64.)[4]

---

[4] The Court notes that the parties have not informed the Court as to the current status of Plaintiff's CFC case. In the Joint Status Report filed on January 3, 2012, the parties indicated that the United States had filed a motion to dismiss the CFC case on June 20, 2011, ten days before the IBLA issued its final decision, and that motion was pending before the CFC.  (Doc. 49, 5:11-16.)  No further update has been provided by the parties.  A review of the CFC docket reveals that the United States' had renewed the motion to dismiss, which is currently pending.

### III.  PARTY CONTENTIONS ON APPEAL

**A.   Plaintiff's Contentions**

Plaintiff's opening brief concerning his APA claims sets forth three issues presented for review: (1) whether Plaintiff has valuable, discoverable mining claims, which the Government improperly denied;  (2) whether the Government unfairly and illegally prevented access to the roads leading to the mining claims; and (3) whether a Plaintiff should be allowed to take a core sample of the minerals to support his claims concerning the quantity and quality of the minerals in question. (Doc. 59, 6:7-13.)

**1.     Plaintiff's Assertions Regarding Valuable, Discoverable Mining Claims**

Plaintiff contends that he has valuable, discoverable mining claims, and that the Government's BLM complaint should have been denied on this basis.  (Doc. 59, 30:1-35:8.)  Plaintiff asserts that his mining claims "have been in his family for a long time" and that they are "located at the end of Horse Canyon Road in the Sequoia National Forest, which is at the actual end of Horse Canyon Road, not at the end of a 'spur road' as the Government claims." (Doc. 59, 30:5-8.)  Plaintiff contends that "[i]f the 1943 Army Corps of Engineers Map is still valid, and absent action by the Kern County Board of Supervisors before 1976, then the claims site is well within 100 feet of Horse Canyon Road[] and[,] therefore, outside the Bureau's jurisdiction."[5]  (Doc. 59, 30:9-13.)

Plaintiff contends that he was not permitted motorized vehicle access to the site and that he "was busy getting estimates of the purity of silicon dioxide, and trying to compile a plan of operation that the silicon dioxide can be mined at a profit."  (Doc. 59, 31:20-22.)  Plaintiff, however, encountered "difficulty" due to his inability to used motorized vehicles because "backpacks and mules are not a cost efficient means of transportation due to the fact that only small quantities can only be moved at one time.  A further problem was the gathering of silicon dioxide can only be done with a hammer and a rod. This is not a cost-effective method of gathering silicon dioxide." (Doc. 59. 31:22-26.)

---

[5] Although Plaintiff contends that the BLM lacked jurisdiction, neither his opening brief nor reply brief contains any discussion regarding his jurisdictional objection.  (*See generally* Docs. 59, 63.)

17

Plaintiff states that he has a buyer who is interested in purchasing his claims, which shows "that the site can be mined " and that "Plaintiff still has a valuable mining claim." (Doc. 59, 33:8-9.) Plaintiff asserts that he has access to Dr. Michel's process, which would allow Plaintiff to "generate a guaranteed profit from the quartz." (Doc. 59. 32:19-33:4.) Plaintiff contends that Defendants have not met their initial burden of presenting a prima facie case that his mining claims are invalid, because "Plaintiff's [c]laims have been mined for over a [c]entury, and . . . since quartz existed at the site before October 1994, there is no basis to strip the [c]laims of their mining character." (Doc. 59, 33:16-18.)

Plaintiff sets forth that the Government prevented him from entering his claim to gather information necessary to prove the existence of a discovery. (Doc. 59, 34:21-27.) Plaintiff thus asserts that the "existence" of minerals at his claims is sufficient to "defeat all or part of the Government's [c]ontest." (Doc. 59, 35:5-8.)

2.   **Plaintiff's Assertions that the Government Unfairly and Illegally Prevented Access to the Roads Leading to the Mining Claims**

Plaintiff asserts that he has "tried to operate his mining claims, and [has] sought 'permission' to go up Horse Canyon Road to start mining his claims." (Doc. 59, 35:11-12.) Plaintiff states that his "family has owned the mining claims" and "recorded ownership," and that "both the road and the mining claims have existed before there was a Sequoia National Forest." (Doc. 59, 35:11-15.) Plaintiff thus asserts that his mining claims and Horse Canyon Road existed before the Sequoia National Forest was created in 1908, and thus he "had the right to ingress and egress to the mining claims without 'getting permits' or by solely relying on pick axes and donkeys." (Doc. 59, 36:3-7 (emphasis omitted).) Plaintiff further asserts that the 1943 Army Corps of Engineers Map shows that Horse Canyon Road ended at the mining claims and was not used as a "spur road"; thus the Government has no right to prevent Plaintiff from using his mines. (Doc. 59, 36:6-10.)

3.   **Plaintiff's Assertions that He Should Have Been Permitted to Take a Core Sample to Support His Contentions as to the Quality and Quantity of the Minerals in Question**

Plaintiff contends that a dispute exists between Plaintiff and the Government as to the quality quartz on the White Cap sites. (Doc. 59, 36:17-20.) Plaintiff asserts that the Government prevented

1  him and his agents from performing tests, including gathering core samples that would have shown

2  the quality and quantity of the minerals at the site.  (Doc. 59, 37:14-22.)

3         Plaintiff also asserts that Dr. Michel's process is now patented and that "the Government

4  willfully withheld the mineral examination report being issued to the Plaintiff" so as to avoid

5  "admitting that there was a dispute regarding Dr. Michel's process," thus "denying Plaintiff the

6  opportunity to satisfy the Government as to Dr. Michel's process."  (Doc. 59, 37:22-25.)  Plaintiff

7  states that, because the Defendants failed to sign the confidentiality agreement concerning Dr.

8  Michel's process and failed to timely ask for a "demonstration of the new patented process,"

9  Defendants "should be estopped from ever disputing Dr. Michel's process."  (Doc. 59, 38:3-5.)

10  Plaintiff states that the Department of the Interior should *sua sponte* hold an evidentiary hearing

11  regarding Dr. Michel's process.  (Doc. 59, 38:1-2.)

12         Plaintiff further asserts that he has presented evidence that the mining costs would be $27 per

13  ton and that he had a buyer, which shows that his claims were valuable.  (Doc. 59, 39:1-18.)

14  **B.     Defendants' Contentions**

15         Defendants contend that the IBLA opinion demonstrates that the IBLA applied the law

16  accurately and relied on substantial evidence in the record to affirm the ALJ's decision that the White

17  Cap Nos. 1-3 claims were null and void.  (Doc. 62, 18:22-24.)   Defendants assert that the three

18  issues raised by Plaintiff for review – 1) whether Plaintiff had identified a valuable mineral deposit

19  locatable under mining laws; 2) whether the US. unfairly deprived Plaintiff of access to the roads

20  leading to the mining claims; and 3) whether Plaintiff should now be allowed to gather core samples

21  to support his position that his claims are valid – are inappropriately argued at this time.  (Doc. 62,

22  18:24-19:5.)  Defendant contends that Plaintiff's task is not to demonstrate whether there was some

23  evidence to support his claim, but instead to show that the IBLA's conclusion that his mining claims

24  were invalid was arbitrary, capricious, otherwise not supported by law, or not supported by

25  substantial evidence.  (Doc. 62, 19:3-7.)   Defendants contend that because the IBLA correctly

26  applied the law, and because substantial evidence in the record supports that conclusion, the Court

27  should affirm the IBLA's decision and dismiss Plaintiff's APA claims.  (Doc. 62, 19:7-9.)

28

1    Defendants further contend that Plaintiff failed to prove the discovery of a valuable mineral

2    deposit.  Plaintiff was required to prove the discovery of an exposure of a valuable mineral deposit

3    in place within the boundaries of each of his three individual mining claims, and must show that

4    these claims were valid as of October 31, 1994 – the date of withdrawal under the CDPA – and at

5    the time of the administrative hearing.  (Doc. 62, 19:10-21.)

6    To contest the validity of a mining claim, the Government bears the burden of establishing

7    a prima facie case that the claim is invalid.  If the Government meets that burden, that claimant

8    asserting the mining claim must demonstrate by a preponderance of the evidence that the claim is

9    valid.  Defendants contend that the United States established a prima facie case setting forth that

10   Plaintiff's claims were invalid and, as such, Plaintiff bore the ultimate burden to show that his claims

11   were valid.  (Doc. 62, 20:1-22:27.)  Defendants assert that the IBLA properly relied on the testimony

12   of the Forest Service expert mineral examiners and the mineral reports in determining that the

13   Government had met its burden.  (Doc. 62, 21:4-20.)  Further, the Government presented economic

14   evidence that the exposed quartz did not constitute a valuable discovery.  (Doc. 62, 22:9-27.)

15   Defendants assert that the IBLA's validity determination was not arbitrary or capricious

16   because the IBLA considered the full evidentiary record and determined that Plaintiff failed to show

17   by a preponderance of the evidence that he had a valid mining claim.  (Doc. 62, 23:1-27:24.)

18   Defendants contend that Plaintiff bears the burden to submit probative evidence documenting an

19   exposed lode or vein on White Cap Nos. 2 and 3 and, because he did not do so, the Government's

20   evidence is unrefuted.  (Doc. 62, 24:8-12.)  Accordingly, the IBLA reasonably affirmed the ALJ's

21   determination that White Cap Nos. 2 and 3 were invalid.  (Doc. 62, 24:12-13.)  As for White Cap

22   No. 1, Defendants assert that the Government established during that administrative hearing that the

23   potential markets for the quartz material on White Cap No. 1 were limited and that the cost of

24   mining and processing that material exceeded the price at which the material could be sold in those

25   markets.  (Doc. 62, 24:15-18.)  Thus, to succeed on his APA claim, Plaintiff was required to show

26   that the IBLA's reliance on the evidence the United States presented was arbitrary or capricious, not

27   that he presented contrary evidence.  (Doc. 62, 24:18-21.)  Defendants contend that Plaintiff failed

28   to make this showing.  (Doc. 62, 24:23-27:18.)  Thus, Plaintiff failed to meet his burden to

demonstrate that the IBLA's conclusion that his claims are invalid is arbitrary and capricious. (Doc. 62, 27:16-18.)

Additionally, Defendants contend that Plaintiff's attempt to re-argue the validity of his claims demonstrates a misunderstanding of his burden in this Court. (Doc. 62, 27:18-19.) Further, the issues raised by Plaintiff lack support. (Doc. 62, 27:24-32:24.) Defendants contend that the Forest Service did not deny Plaintiff access to his claims. Although Plaintiff asserts that he was prohibited from using motorized vehicles to reach his claims due to their designation in a wilderness area, restrictions on motorized vehicles do not equate to a prohibition to access the claims. (Doc. 62, 28:9-19.) Defendants contend that the Forest Service allowed Plaintiff's representative David Brown to use motorized vehicles to access the claims to take samples and Plaintiff was permitted to use motor vehicles during the mineral examination. (Doc. 62, 28:22-26.) Defendants state that the Forest Service did not indicate that other uses of motor vehicles would be prohibited, but instead required Plaintiff to submit a Plan of Operations and obtain approval before such access occurred – which Plaintiff failed to do. (Doc. 62, 28:26-29:4.)

Defendants contend that Plaintiff's allegations concerning the alleged public character of the road leading to the mining claims are inaccurate, and his reliance on the 1943 map produced by the U.S. Army Corps of Engineers is misplaced because that was not the map used by Congress in designating the lands within the Kiavah Wilderness. (Doc. 62, 29:5-23.) Further, the mere existence of a road is insufficient to make it a public highway. (Doc. 62, 30:9-10.)

Finally, Defendants assert that Plaintiff's request to conduct core sampling was properly rejected by the ALJ. (Doc. 62, 31:11-32:24.) Plaintiff was aware as early as 1994 that core sampling would assist him in adequately assessing his claims, which was reasserted during the 2002 mineral examination. (Doc. 62, 19:25.) However, Plaintiff waited an additional seven years, until 2009, before filing a motion with the ALJ, which was filed approximately one month prior to the validity hearing requesting to conduct additional sampling; the motion was denied on several reasonable grounds. (Doc. 62, 31:26-32:17.)

**C.     The Parties' Reply Briefs**

In reply, Plaintiff reiterated the three issues raised in his opening brief but failed to address any of Defendants' assertions, including the contention that Plaintiff has applied the incorrect standard of review.  (*See* Doc. 63.)  Defendants' reply brief notes that Plaintiff "ignores the arguments made by Federal Defendants in their opening brief and the deferential standard of review that this Court applies when reviewing the determination of the IBLA"; instead, Plaintiff reasserts his prior arguments.  (Doc. 64, 2:5-9 (citations omitted).)

## IV. DISCUSSION

**A.     Judicial Review of the Administrative Decision**

"The district courts have jurisdiction to review administrative decisions of the Secretary of the Interior pursuant to 28 U.S.C. s 1331(a)."  *Doria Mining & Eng'g Corp. v. Morton*, 608 F.2d 1255, 1257 (9th Cir. 1979) (citation omitted).  Pursuant to the Department of the Interior regulations, "administrative remedies must be exhausted before any administrative decision from the Department is subject to judicial review."  *Id*.  "Administrative remedies are deemed exhausted upon disposition of a claim which is not appealable to either the Director of the Interior Office of Hearings and Appeals or an Appeals Board such as the IBLA.  A decision of the IBLA is not subject to further appeal before either the Director or any Appeals Board."  *Id*. (citation omitted).  Accordingly, the IBLA's decision "constitute[s] the Secretary of the Interior's final decision" and the "district court thus ha[s] jurisdiction to review the IBLA judgment."  *Id*.

**B.     Legal Standard**

The APA, 5 U.S.C. §§ 701-06, governs judicial review of final agency actions.  *Id*. at § 702. In reviewing decisions of the IBLA, the district court exercises a limited standard of review, reversing the IBLA's decision "only if that decision is arbitrary, capricious, not supported by substantial evidence, or contrary to law."  *Hjelvik*, 198 F.3d at 1074.  The IBLA's decision would be arbitrary and capricious if the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not

be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

To determine whether the IBLA's decision is supported by substantial evidence, "the court reviews the entire record to determine whether it contains such relevant evidence as a reasonable mind might accept as adequate to support a conclusion, and whether it demonstrates that the 'decision was based on a consideration of the relevant factors.'" *Id.* (citations and quotation marks omitted). The court may not substitute its judgment for that of the agency. *Natural Resources Defense Council, Inc. v. Hodel*, 819 F.2d 927, 929 (9th Cir.1987); *see also Wieler v. United States*, 364 F. Supp. 2d 1057, 1061 (D. Alaska 2005).

**C.    The IBLA's Decision is Supported by Law and Substantial Evidence and is Not Arbitrary and Capricious**

As noted above, this Court reviews the decision of the IBLA and will reverse "only if that decision is arbitrary, capricious, not supported by substantial evidence, or contrary to law." *Hjelvik*, 198 F.3d at1074. Here, the IBLA reviewed the ALJ's decision, discussed the ALJ's findings, and applied the applicable law, determining that the Government had established a prima facie case that Plaintiff's mining claims were invalid and that Plaintiff failed to rebut that finding by a preponderance of the evidence. *McKown*, 181 IBLA at 189-204. Accordingly, the IBLA affirmed the ALJ's decision, finding that the ALJ had committed "no error" when he "properly ruled that McKown had not shown that he discovered a valuable mineral deposit on White Cap Nos. 1, 2, or 3, on both the date of withdrawal and the time of the contest hearing." *Id.* at 204.

Although Plaintiff cites to the correct standard of review that the IBLA's decision should be reversed only if it is arbitrary, capricious, not supported by substantial evidence, or contrary to law (*see* Doc. 59, 6:14-15), it appears that Plaintiff either misunderstands the standard of review or understands the standard and has chosen to ignore it. Rather than discussing any purported defects in the IBLA's decision, Plaintiff attempts to re-litigate the evidence to assert that his mining claims are valid. (*See* Doc. 59, 30:1-41:11.) Plaintiff's assertions, however, do not undermine the IBLA's findings and fail to show that the decision was improper and not supported by substantial evidence.

1    As noted above, when the Government contests the validity of a mining claim, it bears the

2    initial burden of providing sufficient evidence to establish a prima facie case that the claim is invalid.

3    *See Hjelvik*, 198 F. 3d at 1074-75.   A "prima facie case means that the case is adequate to support

4    the Government's contest of the claim and that no further proof is needed to nullify the claim.   The

5    Government does not have to negate the evidence presented by the mining claimant.   If the

6    Government shows that one essential criterion of the test was not met, it has established a prima

7    facie case."   *Id*. at 1075 (citation omitted).   Once the Government establishes a prima facie case,

8    "[t]he burden then shifts to the claimant to show by a preponderance of the evidence that a valuable

9    mineral deposit has been discovered."   *Lara*, 820 F.2d at 1542 (citation omitted).   Thus, while the

10   Government bears the initial burden, once that burden has been met, it is the claimant, and not the

11   Government, who bears the ultimate burden of persuasion with respect to the claim's validity.   *See*

12   *id.*; *United States v. LeFaivre*, 138 IBLA 60, 67 n. 6 (1997).

13          **1.      The Government Established a Prima Facie Case**

14   The IBLA reviewed the ALJ's decision and concluded that the Government established a

15   prima facie case that the mining claims on White Cap Nos. 1-3 were not valid.   *McKown*, 181 IBLA

16   at 196-97.   In determining that the Government established a prima facie case, the IBLA relied upon

17   the testimony of the Government's mineral examiners and the Mineral Report.[6]   *Id*. at 197.   "A prima

18   facie case is established when a Government mineral examiner gives his expert opinion that he

19   examined the claim and found insufficient values to support a finding of discovery."   *United States*

20   *v. Mansfield*, 35 IBLA 95, 99 (1978).

21   The IBLA's decision noted that "[f]or a lode mining claim to be valid, 'a vein or other

22   mineralized ore body must be exposed' on that claim."   *McKown*, 181 IBLA at 196 (citing *United*

23   *States v. Newman*, 178 IBLA 174, 183 (2009)); *see also Waskey v. Hammer*, 223 U.S. 85, 90 (1912)

24   (finding that the mining laws "make the discovery of mineral within the limits of the claim a

25   

26          [6] Although Plaintiff contends that Mineral Report is "cursory" and thus unreliable, Plaintiff's contention is not
supported by a review of the Mineral Report itself.   The Mineral Report is a 191-page document prepared by two

27   experienced Forest Service geologists that is based upon three separate site inspections to the mining sites, mapping of
the claims, taking samples, locating claim corners, evaluating access to the claims, estimating the cost of extraction of

28   the minerals, and investigating potential markets.   (*See* AR 1212-1410.)   Plaintiff does not explain how such a report is
"cursory."   (*See* Doc. 63, 5:20-23.)

prerequisite to the location of a claim") (citation and quotation marks omitted).  As such, if the Government shows that "no exposure of a vein or lode exists on the claim or if a deposit is exposed, that it is of insufficient quantity or quality to show that a prudent person would expend the effort necessary to develop that deposit into a paying mine with a reasonable prospect for success," then the Government establishes a prima facie case that the claim is invalid.  *McKown*, 181 IBLA at 196-97.

Regarding White Cap Nos. 2 and 3, the IBLA noted that the Government mineral examiners "searched for exposed mineralization on White Cap Nos. 2 and 3, but found no such exposure on either of them.  The Government therefore established a prima facie case that White Cap Nos. 2 and 3 are not valid claims based on the testimony of its mineral examiners." *Id*. at 197 (citing *Newman*, 178 IBLA at 181-82, 183-84.)  Regarding White Cap No. 1, the IBLA found that although there was an exposed deposit, "the Government's case-in-chief showed that this quartz (silica) deposit was of insufficient quality and quantity to constitute the discovery of a valuable mineral deposit (i.e., the cost to mine, haul, and process its quartz (silica) would exceed the price it could command in the marketplace on both the date of withdrawal and the date of the contest hearing)" and thus concluded that the Government had established a prima facie case that White Cap No. 1 was not a valid mining claim.  *McKown*, 181 IBLA at 197.

The evidence supports the IBLA's conclusions.  The Mineral Report concluded that White Cap Nos. 2 and 3 "did not have significant quartz resources," and White Cap No. 1 had insufficient "economics and marketability" to be a valid claim.  (*See* AR 1219.)  Further, the ALJ noted that the Government witnesses testified that there were no exposed minerals observed on White Cap Nos. 2 and 3 and that these claims were not mineral in character.[7]  (*See* AR 160-61.)  The Government witnesses also testified that the quartz located on White Cap No. 1 was neither of sufficient quality

---

[7] The exposed quartz in the White Cap pit is in the center of the White Cap No. 1 and 3 claims.  (AR 1218.) In order to establish existing mining rights, Plaintiff was required to prove the discovery of an exposure of a valuable mineral deposit within each of his three mining claims.  *United States v. Mavros*, 122 IBLA 297, 302 (1992).  Since the Government considered the exposed pit as the basis for the claim to White Cap No. 1 (*see* AR 1218), the same pit cannot be the basis for the claim to White Cap No. 3.

1  or quantity to make its mining economically viable for the potential markets identified.  (*See* AR

2  162-64.)

3       Plaintiff contends that "the Government hasn't met its initial burden," and asserts that

4  "Plaintiff's [c]laims have been mined for over a [c]entury, and since quartz existed at the site before

5  October 1994, there is no basis to strip the [c]laims of their mining character."[8] (Doc. 59, 33:16-18.)

6  Plaintiff also contends that "[t]he Government still has not rebutted the fact that minerals exist on

7  the White Cap claims."  (Doc. 63, 3:19-20.)  Plaintiff, however, is not applying the correct standard

8  of review.  It is *not* the Government's burden to prove that minerals do not exist on the claim sites,

9  but to instead make a prima facie showing that the mining claims are invalid even with the existence

10  of minerals on White Cap No. 1 (the Government had established that there were no visible minerals

11  on White Cap Nos. 2 and 3).  The IBLA's decision states the reasons how the Government made this

12  showing, and substantial evidence in the record supports the IBLA's determination.  *McKown*,

13  181 IBLA at 196-97.

14
15       **2.     The IBLA Properly Determined that Plaintiff Failed to Meet His Burden by a Preponderance of the Evidence**

16       As the Government made a prima facie showing that the claims on White Cap Nos. 1-3 were

17  invalid, the burden shifted to Plaintiff to show by a preponderance of the evidence that his mining

18  claims were valid.  The IBLA decision considered the evidentiary record and determined that the

19  ALJ did not err in concluding that Plaintiff had not shown that he had discovered a valuable mineral

20  deposit on both the date of withdrawal and the date of the contest hearing as required.  *Id*. at

21  199-203; *see also Lara*, 820 F.2d at 1542 ("Because the right to prospect for minerals ceases on the

22  date of withdrawal, a discovery must have existed at the date of withdrawal as well as at the date of

23  the hearing.") (citations omitted).  Plaintiff has not shown that the IBLA's finding was arbitrary or

24  capricious, not supported by the evidence, or contrary to law.

25
26
27
28
     [8] It is unclear what previous mining Plaintiff is referring to, since there are no allegations that the minerals in question were being mined in the past.  Further, the Mineral Report indicates that the mineral examiners did not find evidence of any mining activity after 1976.  (*See* AR 1235-36.)

1    As the IBLA decision notes that, "[o]nce land has been withdrawn from mineral entry,

2    drilling may only be permitted where it constitutes an effort to confirm the pre-existing discovery

3    of a valuable mineral deposit . . . . At the very least, there must be a showing that there has been an

4    exposure of valuable minerals before permission may be granted to determine the extent thereof."

5    *Id*. at 199 (citing *United States v. Crowley*, 124 IBLA 374, 378 (1992) (internal citation omitted)).

6    "The exposure within the claim of a mineral deposit containing mineral values worth exploiting is

7    a necessary precondition to the discovery of a valuable mineral deposit."   *United States v. Pass*

8    *Minerals, Inc.*, 168 IBLA 115, 122 (2006).

9    The IBLA found that Plaintiff "failed to identify a valid discovery point" on White Cap Nos.

10   2 and 3 and, "while he asserted they contain an extension of the deposit exposed on White Cap

11   No. 1, his assertion is not the same as or a substitute for an exposure [of minerals]." *McKown*, 181

12   IBLA at 199 (citing *United States v. Bagwell*, 143 IBLA 375, 392-93 (1998)).  The IBLA found that

13   because Plaintiff "did not proffer any probative evidence showing that he had exposed a lode or vein

14   on White Cap No. 2 or No. 3, we conclude he did not meet his burden and therefore affirm ALJ

15   Heffernan's ruling that both these claim are invalid." *McKown*, 181 IBLA at 199.

16   Substantial evidence supports the IBLA's findings as to White Cap Nos. 2 and 3.  The

17   mineral examiners visited the claim sites on three separate occasions to conduct a comprehensive

18   field examination and did not identify any exposed minerals on these claims.  (*See* AR 1238-40.)

19   Plaintiff and his representatives were present for two of those examinations and failed to direct the

20   mineral examiners to any exposed outcropping that could support a discovery of a valuable mineral

21   deposit.  (*See* AR 1238-40.)   Further, the mineral examiners did not observe an exposure on an

22   in-place quartz deposit or an exposure of any other locatable mineral deposit on these claim sites.

23   (*See* AR 1237-39.)  Plaintiff failed to refute the Government's findings and thus meet his burden of

24   showing, by a preponderance of the evidence, that such claims exist as to White Cap Nos. 2 and 3.

25   There is also substantial evidence to support the IBLA's findings regarding Plaintiff's claim

26   as to White Cap No. 1.  The IBLA found Plaintiff failed to show by a preponderance of the evidence

27   "that the quartz (silica) on this claim could be mined at a profit on both" the withdrawal date and the

28   date of the contest hearing. *McKown*, 181 IBLA at 200.  The IBLA deferred to the ALJ, and found

27

1   that Plaintiff did not meet his burden of proof in showing error in the ALJ's decision. *Id*. at 201-02.

2   The IBLA found that the ALJ "comprehensively summarized the evidence and determined, '[o]n

3   balance, the weight of the evidence adduced at the hearing supports the Government's contentions

4   with respect to the invalidity of all three of the White Cap Claims.'" *Id*. at 201 (citing ALJ's decision

5   (*see* AR 170)).

6       The IBLA further "reviewed the record against the arguments here raised by McKown and

7   conclude[d] that he has not shown error in ALJ Heffernan's consideration of the evidence presented

8   and determination that these claims are invalid." *Id*. at 201-02.  Again, substantial evidence supports

9   the ALJ's findings.  Plaintiff's burden is not to show that he provided contrary evidence at the

10  hearing.  Instead, Plaintiff must show that the IBLA's and the ALJ's decisions were arbitrary or

11  capricious or were not supported by law or fact.  Plaintiff has failed to make this showing.  The ALJ

12  and the IBLA rejected Plaintiff's evidence, finding that it did not rebut the Government's evidence.

13      Plaintiff contends that he was planning to rely on Dr. Michel's process to purify the silica in

14  his claim, and asserted that the processed silica could then be sold at high-end markets for over

15  $40,000 per ton.  *Id*.  However, as the IBLA noted, the Government showed that Dr. Michel process

16  did not exist on the withdrawal date of October 31, 1994, and was therefore not an established

17  technology for processing industrial silica used in any known market in 1994.  *Id*.  Plaintiff did not

18  submit evidence to show that Dr. Michel's system was, in fact, being used in 1994.  As such, Plaintiff

19  could not establish that Dr. Michel's system could have been used on the withdrawal date and thus

20  failed to meet his burden to show that his claim was marketable on the date of withdrawal.  Further,

21  at the time of the validity examination in 2001, the Michel process remained in the testing and

22  research phase (*see* AR 1252-54), and Plaintiff did not provide evidence that any company was using

23  the process for industrial silica uses at the time of the contest hearing.[9]

24  _____

25      [9] Although Plaintiff states that Dr. Michel's process is now patented (Doc. 59, 26:4), the evidence in the record
    regarding the alleged patent is unclear.  Plaintiff submitted a letter from David Pierce, who states that he is Dr. Michel's

26  "successor," and describes a process that Dr. Michel patented for processing precious metals. (AR 1113.)  Although
    McKown alleges that he could not provide details about Michel's "secret process" at the time of the validity examination

27  in 2006 because the Michel process was not yet patented, (Doc. 59, 32:19-22), the patent referenced in Pierce's letter,
    U.S. Patent No. 4,268,307, was issued in 1981. *See* U.S. Patent & Trademark Office, Number Search, available at:

28  http://patft.uspto.gov/netahtml/PTO/srchnum.htm (last visited Oct. 3, 2012). It is uncertain whether the "secret process"
    upon which Plaintiff  relies is the same process described in Michel's 1981 patent or whether it is some other, unique

Further, Plaintiff does not provide any evidence related to the costs associated with Dr. Michel's process, and thus has not shown that, even if the quartz could be sold at over $40,000 per ton, this figure would in fact be profitable. "The supplemental marketability test requires a showing that the mineral deposit can be extracted, removed, and marketed at a profit." *Hjelvik*, 198 F.3d at 1074. Plaintiff has failed to make that showing.

The only evidence that Plaintiff submits regarding costs is a letter from Adams representing that, in 1997, the costs to mine the claims would be $27 per ton. (AR 1107.) However, as the IBLA notes, Adams estimated costs for 1997, but did not provide an estimate of costs for 1994 at the time of the withdrawal and did not provide a revised estimate for time of the contest hearing in 2010. *McKown*, 181 IBLA at 204. As such, Adams' evidence does not support Plaintiff's burden. Additionally, even if Adams' figures were relevant, the Government presented evidence that the market rate for the quartz material in 1994 was between $14.82 and $18.66 per ton (AR 1280); Adams' cost of mining at $27 per ton thus does not support a claim of profitability since the cost to mine the quartz was significantly higher than the market rate at which the quartz could be sold.

Finally, Plaintiff contends that he had an offer to purchase his mining claims from Jones, who would have paid $33 million for the mining claims. However, this purported offer did not occur until either 2004 or 2005 (Doc. 59, 25:6-7) and the IBLA thus concluded that the offer was not relevant to showing the value of Plaintiff's claims as of the withdrawal date in 1994. *McKown*, 181 IBLA at 203, n. 19. Further, although Jones testified that he believed that he could make a profit on the mines using Dr. Michel's process, the IBLA found that "Jones was not proffered as an expert, and his testimony as to why he made his offers was as a fact witness and not the opinion of duly qualified expert (e.g., an experienced mineral processor, silica wholesaler, or purchaser of processed silica). His offers simply do not constitute objective proof that a paying mine can or could have been developed on McKown's claims." *Id*. at 203.

---

process. If it is the former, which was patented in 1981, Plaintiff has not explained why he could not provide information about this patented process to the mineral examiners at the time of the validity examination in 2006. If it is the latter, and was patented at a later time, it appears that Plaintiff has failed to actually present any evidence describing the process he planned to use, since the only submitted evidence pertained to Dr. Michel's 1981 patented process.

As noted above, to determine whether the IBLA's decision is supported by substantial evidence, "the court reviews the entire record to determine whether it contains such relevant evidence as a reasonable mind might accept as adequate to support a conclusion, and whether it demonstrates that the decision was based on a consideration of the relevant factors." *Motor Vehicle Mfrs. Ass'n of U.S., Inc.,* 463 U.S. at 43 (citations and quotation marks omitted). The court may not substitute its judgment for that of the agency. *Natural Resources Defense Council, Inc.*, 819 F.2d at 929. Here, the IBLA noted that the Government established that Plaintiff's claim was not marketable on either the withdrawal date or the hearing date. *McKown*, 181 IBLA at 200.

Accordingly, the IBLA's decision that Plaintiff did not show, by a preponderance of the evidence, that he had a valid mining claim is supported by substantial evidence in the record. As such, the decision is AFFIRMED.

**3.     The Issues Raised by Plaintiff are Improper on Appeal and Do Not Alter the IBLA's Findings**

As noted above, Plaintiff's brief raises three issues: (1) Plaintiff had a valuable, discoverable mining claim; (2) the Government unfairly and illegally prevented Plaintiff from accessing the roads leading to the claim; and (3) Plaintiff should be allowed to take a core sample to support his contentions concerning the quantity and quality of the minerals.

Concerning Plaintiff's first issue, for the reasons set forth above, the ALJ and the IBLA found that Plaintiff does not, in fact, have a valuable, discoverable mining claim. As discussed above, the Government established the Plaintiff's mining claim were not valid, and Plaintiff failed to meet his burden by a preponderance of the evidence to rebut the Government's finding.

Concerning Plaintiff's second issue, Plaintiff asserts that he should have been permitted motorized vehicle access to the mining site and that this restriction was improper because Horse Canyon Road was either excluded from the Kiaveh Wilderness designation or was subject to an exception from the Wilderness Act's restrictions because it was a historic public road under Federal Revised Statute 2477 ("R.S. 2477"). (Doc. 59, 35:9-36:14.) Plaintiff asserts that he was denied access to his mining claims and that, because his claims are "not within the Kiavah Wilderness," he "should be allowed to mine the site." (Doc. 59, 36:10-14.)

Despite Plaintiff's assertion, the IBLA found, "it is clear from the record that the Forest Service did not prevent him from accessing his claims." *McKown*, 181 IBLA at 197.  The IBLA determined that:

> Motorized access would have made it more convenient for McKown to visit his claims, but lack of such access did not prevent him from accessing them. *See Clouser v. Espy*, 42 F.3d 1522, 1535-36 (9th Cir. 1994), cert. denied, 515 U.S. 1141 (1995); *Public Lands for the People, Inc., v. United States Dept. of Agriculture*, 2010 WL 5200944, at *7-8 (E:D.Cal.2010). Nor did the Forest Service preclude him from using motorized or other heavy equipment on his claims (e.g., a drill rig for taking core samples), it simply required him to submit a plan of operations and obtain Forest Service approval before such use and access occurred. As noted by ALJ Heffernan, the record confirms that McKown "never filed the necessary written proposal" to do core drilling and that the Forest Service had, in fact, allowed him "to utilize motorized vehicles and contemporary equipment to access the claims and to collect samples."  Decision at 19. Any actual or perceived limitation on motorized access after these lands were withdrawn from mineral entry simply is not relevant in determining whether these claims were then and currently are valid.

*Id*. at 198-99.  Further, Plaintiff's representatives were permitted to use motorized vehicles to take samples in 2002, as well as during the mineral examination.  (AR 985, 1237).   The Forest Service required Plaintiff to submit a Plan of Operations before any additional motorized access would have been approved; Plaintiff failed to do so.  (AR 985.)

Additionally, although Plaintiff asserts that the 1943 map from the Army Corps of Engineers shows that the access road should not have been part of the wilderness designation, the 1943 map was not the map that Congress used when designating the lands within the Kiavah Wilderness. (AR 979-81.)  The record the IBLA considered includes the legal description of the lands that Congress designated as part of the Kiavah Wilderness on October 31, 1994, (AR 1548-50), and a map of the Kiavah Wilderness based on this legal description. (AR 980, 1202, 1204.)  The record also contains the legal description for the lands Congress excluded as part of Horse Canyon Road.  (*See* AR 1549-50.)  The evidence demonstrates that both the spur road leading into the White Cap Nos. 1-3 claims and the lands within these claims are located entirely within the Kiavah Wilderness and that none of these lands is within the road exclusion for Horse Canyon Road.  As such, Plaintiff's contention that the mining claims were not in the Kiavah Wilderness lacks merit.

Plaintiff states that he was unfairly and illegally prevented from access for using the roads leading to the mining claims, asserting that he had a valid right-of-way under R.S. 2477 because the

roads existed before the designation of the Kiavah Wilderness in 1994.  (Doc. 59, 35:9-36:14.)

"Prior to its repeal in 1976, R.S. 2477 authorized rights-of-way for the construction of highways over

public lands not reserved for public uses. 43 U.S.C. § 932 (repealed 1976).  The law repealing R.S.

2477 expressly preserved any valid, existing right-of-way."  *Lyon v. Gila River Indian Cmty*.,

626 F.3d 1059*, cert. denied* 132 S.Ct. 498, 181 L. Ed. 2d 346 (2011) (citing *Adams v. United*

*States*, 3 F.3d 1254, 1258 (9th Cir. 1993)).  Although Plaintiff claims that the roads leading to his

claims are public roads under R.S. 2477, "[t]he mere existence of [] roads is not enough to make

them 'public highways'" under R.S. 2477.  *Lyon*, 626 F.3d at 1077.  The Ninth Circuit has

emphasized that R.S. 2477 "did not itself *create* R.S. 2477 roads; rather, it *authorized* the states to

construct highways over public lands." *Id.*  Accordingly, for the roads Plaintiff alleges to be public

roads under R.S. 2477, California would have had to establish them as highways over public land

in accordance with California state law.  *See id.*  Plaintiff has not pointed to any evidence in the

record that California has "taken some affirmative act to accept the grant represented by R.S. 2477"

with respect to the roads leading to the White Cap Nos. 1-3. *Id*.

Further, Plaintiff does not have standing to assert the existence of an R.S. 2477 right-of-way

in this proceeding. The Quiet Title Act, 28 U.S.C. § 2409a ("QTA"), provides the exclusive means

by which an adverse claimant may challenge the United States' title to real property, such as the

alleged R.S. 2477 right-of-way in this case.  *See Block v. N. Dakota ex rel Bd. of Univ. & Sch. Lands*,

461 U.S. 273, 286 (1983).  To bring an action under the QTA, Plaintiff must assert that he has a

personal title or interest in the subject right-of-way, not just that the right-of-way is a public road

(and therefore contending that, as a member of the public, he has a right to use the route).  *See*

*Friends of Panamint Valley v. Kempthorne*, 499 F. Supp. 2d 1165, 1177 (E. D. Cal. 2007).

Additionally, the question of whether Plaintiff should have been permitted access to the road

leading to his mining claim has no bearing on whether the mining claim was valid.  In other words,

motorized access to the claims would not validate the claims.  For the reasons explained in detail

above, the Government established that Plaintiff did not have a valid right to mine on White Cap

Nos. 1-3. As such, even if Plaintiff had been allowed motorized vehicle access to the road leading

1   to those claims, he still could not have mined on White Caps Nos. 1-3 because the mining claims

2   were invalid.

3        Concerning Plaintiff's third issue that he should now be permitted to conduct core sampling

4   to support his claim, the IBLA concluded that Plaintiff's request was untimely and was properly

5   rejected by the ALJ. *McKown*, 181 IBLA at 198-99. The IBLA noted that Plaintiff knew as early

6   as 1994 that additional core sampling would have assisted him in accurately assessing his claim. *Id*.

7   at 199. Plaintiff was further made aware of the importance of core sampling in 2002 during the

8   mineral examination. *Id*. However, "[i]t was not until December 2009 that he pursued this issue,

9   not by filing a plan of operations to drill and take core samples with the Forest Service, but by filing

10  a motion with ALJ Heffernan. Noting a lack of specificity on where McKown's proposed core

11  drilling would occur, ALJ Heffernan denied that motion." *Id*.; *see also* AR 1559-70. The IBLA

12  noted that the ALJ had several reasonable grounds to deny Plaintiff's request, including that the

13  request was not specific and that the ALJ was concerned that Plaintiff would engage in exploratory

14  work to prove his claims, rather than to confirm the extent of his discovery. *Id*. at 198-99. However,

15  such exploratory work is prohibited. *See Mavros*, 122 IBLA at 302 (emphasizing that "[n]o further

16  exploration to physically expose valuable mineral of sufficient quality and quantity to constitute a

17  discovery may be permitted" after the date of withdrawal from mineral entry). Additionally, even

18  if Plaintiff had been able to take a core deposit to more accurately define the size of the deposit, it

19  would not have changed the result of the validity contest because, as the IBLA stated, "McKown

20  proffered no probative evidence that any amount of quartz (silica), much less a larger amount, could

21  be profitably mined from that claim." *McKown*, 181 IBLA at 199 n.16. Thus, the ALJ properly

22  found that Plaintiff's request was untimely and failed to satisfy the requirement that he file a plan of

23  operations. Additionally, Plaintiff has not established why his request to conduct further core

24  sampling should be permitted at this time.

25       The issues raised by Plaintiff do not invalidate the findings made by the IBLA. Plaintiff has

26  not shown that the IBLA's decision was arbitrary, capricious, contrary to law, or not supported by

27  the evidence. Accordingly, Plaintiff's appeal is DENIED and the IBLA's decision is AFFIRMED.

28

**D.      The Stay on Plaintiff's non-APA Claims is Lifted**

Plaintiff's FAC contains causes of action concerning the APA claims at issue in this motion, as well as claims for declaratory and injunctive relief, quiet title, civil rights violations under *Bivens*, and illegal restraint of interstate commerce.

On November 18, 2011, the Court stayed the non-APA claims to allow judicial review of the APA claims.  (Doc. 47.)  The Court ordered that "[t]he time for Defendants to file a responsive pleading to Plaintiff's amended complaint shall be stayed pending the conclusion of the judicial review of the APA claims."  (Doc. 47, 6:5-7.)  Accordingly, since this order resolves the dispute concerning Plaintiff's APA claims, the stay is hereby LIFTED, and any responsive pleading by Defendants SHALL BE FILED within thirty (30) days of the date of this order.

**E.      Status Update Regarding Plaintiff's CFC Case**

In the Joint Status Report filed on January 3, 2012, the parties indicated that the United States had filed a motion to dismiss Plaintiff's CFC case on June 20, 2011, ten days before the IBLA issued its final decision, and that the motion was pending before the CFC.  (Doc. 49, 5:11-16.)  No further update has been provided by the parties.  A review of the CFC's docket reveals that the motion to dismiss has been renewed and remains pending.  As such, once the CFC issues a decision, the parties SHALL FILE with the Court a joint status report providing the status of Plaintiff's CFC case within seven (7) days of the date the CFC's order.

**V. CONCLUSION AND ORDER**

Accordingly, IT IS HEREBY ORDERED that:

1.      Plaintiff John McKown's appeal pursuant to the Administrative Procedure Act, 5 U.S.C. §§ 701-06, of the decision of United States Department of the Interior, Interior Board of Land Appeals in *United States v. McKown*, 181 IBLA 183 (June 30, 2011) is DENIED and the IBLA's decision is AFFIRMED;

2.      The stay previously ordered by the Court as to Plaintiff's non-Administrative Procedure Act claims (Doc. 47) is LIFTED;

3.      Any responsive pleading by Defendants to Plaintiff's first amended complaint SHALL BE FILED within thirty (30) days of the date of this order; and

4.      The parties SHALL FILE an update as to the status of Plaintiff's Court of Federal Claims action within seven (7) days of the date from when the CFC issues a decision on the pending motion to dismiss.

IT IS SO ORDERED.

**Dated:    November 5, 2012               _____/s/ Sheila K. Oberto_____**
                                                        UNITED STATES MAGISTRATE JUDGE

35